AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT

for the

District of Maine

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | Case No. 2:11-MJ-48-JHR |
| | ) | |
| Michael R. Thomas | ) | |
| f/k/a Shawn P. Higgins, Sean P. Higgins | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ January 6, 2011 _____ in the county of _____ Cumberland _____ in the

_____ District of _____ Maine _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 876(c) | The Defendant knowingly caused to be delivered by the United States Postal Service a letter addressed to Governor Paul LePage in Augusta, Maine containing a threat to injure the person of LePage. Specifically, the Defendant wrote that he would "put a bullet or two in you, if it's the last thing I do. I'm willing to sacrifice my life just to make sure you die, bastard. I will strike when you least expect it." |

This criminal complaint is based on these facts:

See attached Affidavit of FBI Special Agent Pamela A. Flick

☑ Continued on the attached sheet.

_____
*Complainant's signature*

FBI Special Agent Pamela A. Flick
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  March 24, 2011

City and state:  Portland, Maine

_____
*Judge's signature*

John H. Rich III, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## CRIMINAL COMPLAINT AND SEARCH WARRANTS

I, Pamela A. Flick, having been duly sworn, state as follows:

1.      I have been employed as a Special Agent (SA) with the Federal Bureau of

Investigation (FBI) for sixteen years. I am currently assigned to the FBI's Boston Division,

Portland, Maine Resident Agency. Since joining the FBI, I have been involved in the

investigation of a variety of federal criminal offenses, including domestic terrorism.

2.      I am submitting this Affidavit in support of: (1) a criminal complaint and arrest

warrant charging Michael R. Thomas, formerly known as Shawn P. Higgins, also known as Sean

P. Higgins, with mailing threatening communications, in violation of Title 18, United States

Code, Section 876(c); (2) a search warrant for 1125 Brighton Avenue, #234, the residence of

Thomas; and (3) a search warrant to obtain a sample of buccal (cheek) cells from Thomas, for

the purpose of comparing Thomas's DNA profile with DNA profiles obtained from evidence

related to a threatening mailing sent to Maine Governor Paul LePage.

3.      Since this Affidavit is being submitted for a limited purpose, I have not included

each and every fact that I know concerning this investigation. Rather, I have set forth only those

facts that relate to the issue of whether probable cause exists to support the issuance of the

requested search warrants and criminal complaint.

## PERSON AND RESIDENCE TO BE SEARCHED

4.      Michael R. Thomas, born in April 1960, is approximately 5'10" tall and weighs

approximately 200 pounds, according to information obtained from the Maine Bureau of Motor

Vehicles (BMV). According to a Certificate of Name Change dated February 26, 2007 from the

Aroostook County Probate Court, on May 17, 2005, the name of Shawn Patrick Higgins was

legally changed to Michael Raphael Thomas.

5.     Information obtained from the BMV and the Portland Housing Authority indicates that Thomas resides at 1125 Brighton Avenue, #234, Portland, Maine. The building at this address is known as Loring House, consisting of subsidized housing for senior citizens and adults with disabilities. The building is a three-story red brick structure on the corner of Brighton Avenue and Holm Road. The building is set back from Brighton Avenue and has a gazebo in a large front yard. Unit 234 is on the second floor of the building. It is a one bedroom apartment. Information obtained from the Portland Housing Authority indicates that Thomas has resided at this address since 2007. BMV records also list Thomas as living at this address.

## ITEMS TO BE SEIZED

6.     This Affidavit seeks a search warrant for 1125 Brighton Avenue #234, to search for and seize all items described in Attachment E to this Affidavit.

7.     This Affidavit also seeks a search warrant to obtain a sample of Michael R. Thomas's buccal (cheek) cells, via swabs of the inside of his cheek, so that his DNA profile may be compared to a DNA profile obtained from evidence recovered in connection with the investigation described below. The procedure for obtaining this sample is described in further detail below.

## RESULTS OF INVESTIGATION

### January 6, 2011 Letter

8.     On January 11, 2011, the office of Maine Governor Paul LePage received a letter addressed to LePage via the United States mail. A copy of the letter and envelope in which it was delivered is at Attachment A. The envelope was postmarked January 6, 2011, and bore the marking "SO. MAINE P&DC 040." I know from speaking with individuals from the United States Postal Inspection Service that this is a United States Postal Service (USPS) marking

2

indicating that the letter was processed by the Southern Maine Processing and Distribution Center in Scarborough, Maine. The envelope, which did not bear a return address, had a Forever 2010 Christmas series stamp affixed to it.

9.      As reflected in Attachment A, the unsigned letter included the statement, "**AS FAR AS I'M CONCERNED YOU'RE THE DEVIL HIMSELF AND I WILL PUT A BULLET OR TWO IN YOU, IF IT'S THE LAST THING I DO. I'M WILLING TO SACRIFICE MY LIFE JUST TO MAKE SURE YOU DIE, BASTARD. I WILL STRIKE WHEN YOU LEAST EXPECT IT.**"

10.      The letter and envelope were turned over to the FBI on January 24, 2011, and shipped to the FBI's Questioned Documents Unit in Quantico, Virginia on February 7, 2011. I have reviewed a February 14, 2011 Report of Examination indicating that the letter and envelope were printed using an ink jet process that can be found on numerous brand-name printers.

### March 1, 2011 Letter

11.      On March 3, 2011, the office of Governor LePage received a letter addressed to LePage via the United States mail. A copy of the letter and envelope in which it was delivered is at Attachment B. The envelope was postmarked March 1, 2011, and bore the same USPS marking from its Southern Maine Processing and Distribution Center. The envelope, which had no return address, had a Forever 2010 Christmas series stamp affixed to it.

12.      As reflected in Attachment B, the unsigned letter stated in its entirety:

**GOVERNOR,**

**WHAT GOOD IS GOVERNMENT IF WORDS HAVE NO MEANING? P.S. COMMUNISTS DON'T MISS.**

3

## March 11, 2011 Letter

13.     On March 14, 2011, the office of Governor LePage received a letter addressed to the Office of the Governor via the United States mail. A copy of the letter and envelope in which it was delivered is at Attachment C. The envelope was postmarked March 11, 2011, and bore the same USPS marking from its Southern Maine Processing and Distribution Center. The envelope, which had no return address, had a Forever 2010 Christmas series stamp affixed to it.

14.     As reflected in Attachment C, the letter, which appeared to be directed to Governor LePage, included the statements "**I HOPE YOU ARE ASSASSINATED SOON**" **and "I HOPE YOU SUFFER A LONG SLOW PAINFULLY AGONIZING DEATH BASTARD. DIE YOU PRICK.**"

15.     The envelope and letter were sent to the Maine State Police Crime Laboratory on March 14, 2011. According to a March 23, 2011 report submitted by Forensic DNA Analyst Erin S. Miragliuolo, a full thirteen-locus male DNA profile was obtained from cuttings of a partial fingerprint under the stamp and an area on the back of the stamp.

## 2006 DNA Analysis

15.     I have reviewed reports and other documents from an investigation conducted by the United States Postal Inspection Service in 2005. The investigation began after an envelope containing white powder and an anonymous note was sent via United States mail to the Austin Preparatory School in Reading, Massachusetts. The letter, which went through the Eastern Maine Processing and Distribution Center, had no return address. The anonymous note stated, "'Boom' Guess Who?" DNA was retrieved from the envelope flap and the stamp.

16.     As part of the investigation, on January 19, 2005, buccal swabs were obtained from Sean Higgins, who was determined to be a subject of the investigation. The swabs were

4

sent to Orchid Cellmark laboratories in Dallas, Texas and a full thirteen-locus DNA profile of Higgins was obtained.

17.     Orchid Cellmark compared the DNA profile for Higgins with the DNA obtained from the envelope and stamp sent to the Austin Preparatory School. According to the February 21, 2006 Report of Examination that I have reviewed, the lab concluded that there was an insufficient amount of DNA present on the envelope flap to obtain a DNA profile, and that the DNA profile obtained from the stamp originated from an unknown male other than Higgins.

18.     I have spoken with U.S. Postal Inspector Michael Desrosiers, who interviewed the individual identified as Sean Higgins in the Orchid Cellmark laboratory report on June 22, 2005. After viewing a photograph of Michael Thomas, formerly known as Shawn Higgins, he confirmed that Michael Thomas is the same person he interviewed in 2005 under the name Sean Higgins.

## **Comparison of DNA Profiles**

19.     I have reviewed a March 24, 2011 memo from DNA Analyst Miragliuolo to my colleague, SA Patrick Clancy. In the memo, Miragliuolo indicates that she compared the DNA profile she obtained from the stamp of the March 11, 2011 letter with the DNA profile of Sean Higgins obtained by Orchid Cellmark.

20.     Miragliuolo reports that the thirteen-locus DNA profile obtained from the cuttings of the stamp matches the thirteen-locus DNA profile of Sean Higgins. She concludes that

The estimated probability of selecting an unrelated individual at random from the FBI Caucasian population database having a DNA profile matching Sean Higgins' DNA profile using Profiler Plus and COfiler is 1 in 22.2 quadrillion.

With the exception of identical twins or close relatives, it is concluded to a reasonable degree of scientific certainty that the DNA profile obtained from the cuttings of the stamp … came from Sean Higgins.

5

Miragliuolo's report concludes by stating that a known reference sample from Sean Higgins should be submitted to the laboratory for comparison purposes.

## Need for DNA Sample

21.     Although Miragliuolo was able to match DNA found on the stamp from the March 11, 2011 letter with the DNA profile for Michael Thomas (formerly Sean Higgins) obtained in 2005, I have been informed that for the purpose of testifying at trial, the Maine State Police Crime Laboratory needs to compare the recovered DNA with a DNA profile that is obtained from a known sample of Thomas's cells. There are two reasons for this. First, comparison with a DNA profile that is obtained from a known sample under laboratory conditions eliminates any potential challenges to the chain of custody or to the propriety of the process by which the 2005 DNA profile was obtained. Second, comparing DNA found on evidence with a DNA profile from a known sample eliminates the need at trial to explain why the 2005 DNA profile was obtained (*i.e.,* because Thomas was previously under investigation for a threatening communication).

22.     I have learned from training and experience, and from speaking with personnel from the state laboratory, that an easy and effective method for determining an individual's DNA is by obtaining a sample of the individual's buccal (cheek) cells and testing them. I have cotton-tipped swabs for the purpose of obtaining these samples. The swabs are placed in the subject's mouth and the inside of the cheek is vigorously swabbed, resulting in the transfer of buccal cells onto the cotton bulb of the swab. The swabs are then placed in a plastic container prior to being delivered to the laboratory. The collection process may be carried out by a law enforcement officer, and the process is sterile and safe for both the donor and the collector.

23. If permitted to obtain a sample of Thomas's buccal cells, I plan to request that the state laboratory and/or the FBI laboratory determine Thomas's DNA profile and determine if it matches the DNA profile found on the stamp from the March 11, 2011 letter.

## Computers, Electronic Storage, and Forensic Analysis

24. As described above and in Attachment E, this application seeks permission to search and seize records that might be found at 1125 Brighton Avenue #234, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

25. I submit that if a computer or storage medium is found at this address, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by

7

an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

        c.      Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

        d.      Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

    26.      As further described in Attachment E, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also for forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any computer in the subject premises because:

        a.      Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the

8

attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

      b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

      c.    A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

      d.    The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

27. Searching storage media for the evidence described in Attachment E may require a range of data analysis techniques. In most cases, a thorough search for information stored in storage media often requires agents to seize most or all electronic storage media and later review the media consistent with the warrant. In lieu of seizure, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The nature of evidence. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on premises could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly search storage media to obtain evidence, including evidence that is not neatly organized into files or documents. Just as a search of a premises for physical objects requires searching the entire premises for those objects that are described by a warrant, a search of this premises for the things described in this warrant will likely require a search among the data stored in storage media for the things (including electronic data) called for by this warrant.

10

Additionally, it is possible that files have been deleted or edited, but that remnants of older versions are in unallocated space or slack space. This, too, makes it exceedingly likely that in this case it will be necessary to use more thorough techniques.

      b.    The volume of evidence. Storage media can store the equivalent of millions of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to peruse all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and it would be impractical and invasive to attempt this kind of data search on-site.

      c.    Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data on-site. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

      d.    Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

28.    Based on the foregoing, and consistent with Rule 41(e)(2)(B), when officers executing the warrant conclude that it would be impractical to review the hardware, media, or peripherals on-site, the warrant I am applying for would permit officers either to seize or to

11

image-copy those items that reasonably appear to contain some or all of the evidence described in the warrant, and then later review the seized items or image copies consistent with the warrant.

## CONCLUSION

29.     Based on the foregoing, I respectfully submit that probable cause exists to believe that: (1) on about January 6, 2011, Michael R. Thomas, formerly known as Shawn P. Higgins, also known as Sean P. Higgins, caused a threat to injure the person of another to be delivered via the United States Postal Service, in violation of 18 U.S.C. § 876(c); (2) evidence of this offense will be found at Thomas's residence, located at 1125 Brighton Avenue #234, Portland, Maine; and (3) evidence of this offense will be found in buccal cells to be obtained from Thomas's person. I respectfully request that the Court issue the requested criminal complaint and search warrants.

Pamela A. Flick
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me this  24ᵗʰ  day of March, 2011, at Portland, Maine.

John H. Rich III
United States Magistrate Judge

12

# ATTACHMENT A



USA FOREVER

SO. MAINE PSDC USO
08 JAN 2015 PM 11 T

Governor Paul LePage
Maine State Capitol
230 State Street
Augusta, Maine 04330

I DID NOT VOTE FOR YOU AND AS FAR AS I'M CONCERNED YOU ARE NOT MY
GOVERNOR. NOW I'M READY TO VOTE WITH A BULLET. YES.
THANK GOD FOR OUR SECOND AMENDMENT REMEDIES.
I'VE GOT YOU IN MY CROSS-HAIRS, BITCH.
AS FAR AS I'M CONCERNED YOU'RE THE DEVIL HIMSELF AND I WILL PUT A
BULLET OR TWO IN YOU, IF IT'S THE LAST THING I DO. I'M WILLING TO
SACRIFICE MY LIFE JUST TO MAKE SURE YOU DIE, BASTARD.
I WILL STRIKE WHEN YOU LEAST EXPECT IT.

# ATTACHMENT B



SO MAINE PROC DIST
05 MAR 2011 PM 3 T

Governor Paul LePage
151 Capitol St # 1
Augusta, Maine
04333

04330+6262

GOVERNOR,
WHAT GOOD IS GOVERNMENT IF WORDS HAVE NO MEANING?

Office

MAR 3 2011

of the
Governor

P.S. COMMUNISTS DON'T MISS.

# ATTACHMENT C

S.O. MAINE P&DC 040

11 MAR 2011 PM 3 L

Office of the Governor
One State House Station
Augusta, MAINE
04333

04333+0081

YOU ARE AN IGNORANT, ARROGANT BASTARD. I DIDN'T VOTE FOR YOU
REPUBLICAN COCKSUCKER. YOU ARE A PIECE OF SHIT. I HOPE YOU
ARE ASSASSINATED SOON. YOU SHOULD RESIGN. YOU SHOULD BE
BURNED ALIVE. YOU SHOULD BE CRUCIFIED. BLESSED IS HE WHO
SPILLS YOUR BLOOD. BLESSED IS HE WHO SPILLS YOUR FAMILY'S
BLOOD. I HOPE YOU SUFFER A LONG SLOW PAINFULLY AGONIZING
DEATH BASTARD. DIE YOU PRICK.

## **ATTACHMENT D**

1125 Brighton Avenue, Portland, Maine is also known as Loring House, consisting of subsidized housing for senior citizens and adults with disabilities. The building is a three-story red brick structure on the corner of Brighton Avenue and Holm Road. The building is set back from Brighton Avenue and has a gazebo in a large front yard. Unit 234 is on the second floor of the building. It is a one bedroom apartment.

**ATTACHMENT E**

1.      All items relating to violations of Title 18, United States Code, Section 876(c) involving Michael R. Thomas, formerly known as Shawn P. Higgins, also known as Sean P. Higgins, between January 2011 and the present, including:

        a.      all records containing or pertaining to communications to Governor Paul LePage or any member of his staff or administration;

        b.      any records containing wording identical or similar to the letters described in this Affidavit;

        c.      All blank paper or envelopes, for comparison with the letters described in this Affidavit;

        d.      Any computers, printers, typewriters, or electronic media that were or may have been used as a means to commit the offense described on the warrant;

2.      For any computer, computer hard drive, or other physical object upon which computer data can be recorded (hereinafter, "COMPUTER") that is called for by this warrant, or that might contain things otherwise called for by this warrant:

        a.      evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

        b.      evidence of the attachment to the COMPUTER of other storage devices or similar containers for electronic evidence;

        c.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

14

> > d.     evidence of the times the COMPUTER was used;

> > e.     passwords, encryption keys, and other access devices that may be

necessary to access the COMPUTER;

> > f.     documentation and manuals that may be necessary to access the

COMPUTER or to conduct a forensic examination of the COMPUTER;

> > g.     contextual information necessary to understand the evidence described in

this attachment.

As used above, the terms "records" and "information" include all of the foregoing items

of evidence in whatever form and by whatever means they may have been created or stored,

including any form of computer or electronic storage (such as hard disks or other media that can

store data); any handmade form (such as writing, drawing, painting); any mechanical form (such

as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides,

negatives, videotapes, motion pictures, or photocopies).